This time is set for the argument in BNSF Railway v. County of Alameda and others. We go deep into the heart of taxes, as we say, so Ms. Prinzing, you may proceed. Good morning, Your Honors. May it please the Court, Margaret Prinzing on behalf of all defendant counties except San Diego, I would like to reserve five minutes of my time. We are here on review of a federal court injunction that intrudes into a core area of state sovereignty, the collection of a state tax. The Supreme Court has declared that federal courts must not make such intrusions unless they are the clear and manifest purpose of Congress. Yet here, even though the federal statute at issue is a discrimination statute which the Supreme Court has interpreted to require an inquiry into whether any differential is justified, the district court refused to consider whether this differential is justified by the railroad industry's own request to be subject to the tax it now claims as discrimination. I don't see. I mean, that seems a difficult argument off the face of the statute. I mean, you have B-1, B-2, B-3, and B-4. B-4 is different than the other Bs. And I think the Supreme Court has been fairly clear about that. Well, I'd like to address that, Your Honor. So beginning with the text of the statute, when the district court came down to the fact that the use of the word discriminate exists in B-4 and not B-3, it concluded that that meant that discriminate in B-4 added an element. But if you look at B-4, it's a catch-all phrase that has been applied to a number of taxes and to a number of exemptions. And so the use of the word discriminate was used for a descriptive purpose to capture all of the taxes that would fall within that provision. And if it has that descriptive purpose, then we can't assume that it also serves the purpose of adding an element to it. The fact that the word discriminates also appears in the prefatory clause signals an intent to apply it throughout the statute. The legislative history supports this. At 5 ER 501-02, Congress was told that courts would not interpret the 4-R Act in the way that the district court has interpreted it. It says this section will not necessarily mean that federal courts will enjoin all-state taxation of rail property, which is the subject of complaint. Railroads will still have to sustain the burden of discrimination or demonstrating that discrimination exists. And moving to the Supreme Court decision. Here, the district court reached its decision because it only considered a portion of what the Supreme Court said in the CSX-1 decision, 562 U.S. 227. In that case, the court said in the context of the 4-R Act, the word discrimination has and has always had just one meaning. And that meaning includes the requirement to consider whether there is any justification for a difference in treatment. And then the court makes clear that it meant what it said about discrimination applying throughout the provision. How do you address this line from CSX-2? What subsection B-4 requires and subsections B-1 through B-3 do not is a showing of discrimination. So when the CSX-2 court made that observation, it was talking about the choice of a comparison group. And under B-1 through B-3, Congress has determined what the comparison group is to be. Commercial and industrial property in the same assessment jurisdiction, for example. It had not done so in B-4. So the CSX-2 court was providing guidance about how the court should go about considering B-4. And in doing so, the courts need to decide what comparison group is similarly situated for purposes of the statute. What the court was not saying is anything about adequate justification. It was just talking about choosing that comparison group. And going back to the CSX-1 court, it talked at the end. After saying that the same definition of discrimination applies throughout the statute, the court then went on to acknowledge that the justification inquiry will present some knotty questions, including the question of whether tax discrimination, tax rate discrimination cases arising under subsection B-3 have differences that are adequately justified. So the Supreme Court in CSX-1 is very clear that this inquiry must take place throughout the statute. Well, let's assume we were to say this justification argument doesn't work. So within the confines of B-3, what's your argument for why the injunction was improper? Absent discrimination, although I'd like to come back to that to make a point, but I want to respond to your question. The district court's ruling is irreconcilable with the text of B-3, which requires a comparison of BNSS property tax rate with the tax rate applicable to commercial and industrial property in the same assessment jurisdiction. Despite this, the district court compared BNSS property tax rate with an alleged average tax rate on all property, regardless of assessment jurisdiction. The district court did so by essentially redefining the term assessment jurisdiction out of existence. The statute defines the term assessment jurisdiction as a geographical area in a state used in determining the assessed value of property for ad valorem taxation. Despite the fact that the statute itself clearly links assessment jurisdiction with assessment, the district court defined it as a geographical area in a state, full stop, which led the court to its conclusion that the term embraces all property located in the state. Isn't that what Trailer Train said to do? I mean, we can debate whether the averaging should be done on a county-by-county basis or a statewide basis, but in terms of whatever falls within that, it's the average of all the property. I thought that was what Trailer Train was saying. Trailer Train was very clear that its ruling applied in this case. It specifically eliminated its ruling to this case, and that's at page 867 of the decision. And that case was really quite different than the one that you have before you now, Your Honors. It dealt with a very specific historical circumstance having to do with the implementation of Prop 13, which for one year only was going to apply a radically different tax rate to property on the secured roll versus the unsecured roll. So the court was focused on trying to figure out how to suss out whether that difference was a violation under the statute to treat the secured and the unsecured roll differently. The court never had to consider the question of what lies in BNSF's assessment jurisdiction because this issue simply didn't come up. In 1983, state-assessed property, which is in the assessment jurisdiction of the state, was taxed exactly the same as locally-assessed property, which is assessed in a unit that is not the state. So the trailer-train court simply never had to decide the issue that's before this court today. What does it mean to compare BNSF's tax rate to the tax rate with other commercial and industrial property in the assessment jurisdiction? Well, I mean, in this case, if the state had said, we're going to have a higher tax rate for railroads, and we can pick one other, like electric utilities, and just those two, your argument would be BNSF's tax rate is fine because when you compare it to electric utilities, it's no higher, and that's the assessment jurisdiction. Actually, Your Honor, that wouldn't be my argument at all. If you look at the text of the statute for B-3, it talks about the tax rate applicable to commercial and industrial property in the same assessment jurisdiction. You begin by defining BNSF's assessment jurisdiction, which is the state. You look at other commercial and industrial property in the same assessment jurisdiction. In California, that's all unitary property. There's over 354 different categories of unitary property in the state of California representing any number of diverse industries. So if the state of California were to single railroads, and I think you said electric companies out, for a separate tax, that would arguably be a violation of the statute under the interpretation that we're providing here. I'm not sure how I understand that because here the BNSF is arguing essentially that that same thing has happened. It's just that you've put more people in this disfavored class by doing the assessment on a unitary basis and subjecting them to a different tax rate. There are more types of things in there beyond railroads and electric utilities, but the problem is essentially the same one. Well, we would put it differently. So the statute very clearly says you have to make the comparison with property in the same assessment jurisdiction. So it allows the comparison or it requires the comparison to be according to what that unit of assessment is. And that gives the state some authority to implement a tax system according to principles that it needs to. But as long as it's in the same assessment jurisdiction and railroads are taxed the same as those in that assessment jurisdiction, then the tax rate is acceptable. And I want to point to something that's not in the briefing, and that is going to the original language of the 4R Act, which is even more clear that assessment jurisdiction is not just a geographical area. But you have to – well, let me read from it. It was originally defined to mean a geographical area such as a state or county, city, township, or special purpose district within such state, which is a unit, for purposes of determining the assessed value of property for ad valorem taxation. In other words, assessment jurisdiction can't just be read to mean any geographical area in the state of California, which is how the district court read it. It is a unit for purposes of determining assessed value of property. Railroads are not in the same unit as locally assessed property. The unit used for purposes of determining the assessed value of railroads is the state. The unit used for purposes of determining the assessed value of local homes and businesses is not the state. They're not in the same assessment jurisdiction, and comparing their rates violates the plain language of the statute, both in its current and original forms. And I think your question – The definition says the term assessment jurisdiction means a geographical area in a state. I mean, a geographical area is based on location. It's not based on how the state decides to structure the taxing authority. That has a different meaning for jurisdiction than I think what this statute is getting at. Well, it means a geographical area in a state used in determining the assessed value of property for ad valorem taxation. Correct. That's pretty crucial, and the district court's interpretation doesn't give any meaning to that phrase at all. And that's where the district court falls down on this. Now, I want to briefly, with my minute left, make a final point about discrimination that's also not in the briefs. The district court concluded at BNSF's urging that it could not separately consider discrimination under subsection B3 because Congress had already declared in the preface that a violation of subsection B3 constitutes discrimination. Counties have already explained why this misconstrues the text of the statute. But even if the district court were right about that, it cannot be said that Congress concluded that this tax is discriminatory. Under the district court's reasoning, Congress concluded that a railroad tax is discriminatory if it's higher than the tax on commercial and industrial property in the same assessment jurisdiction. Congress did not conclude under anyone's theory that a tax is discriminatory if it's higher than the average tax on all property in the same county. At a minimum, then, even if an inquiry into discrimination isn't appropriate in all subsection B3 cases, it is appropriate here where Congress never declared that this difference constitutes discrimination. And I'd like to reserve the balance of my time. Before you go, can I ask a question? It seems like the problem here is just difficult to determine what the commercial-industrial property tax is. And so whose burden should that be? Should it be on the counties or on the railway systems of determining which, because it's difficult to find the comparable rate, shouldn't the tie go to the railway? Well, I think the burden is on BNSF in this case. Why is that? Because they're seeking the preliminary injunction. So the burden is on them. And the only evidence that we have that you can't isolate the rate on commercial and industrial property is based on a statement from this court in 1983 about what was possible then. Things have changed quite a bit from then until now. And then in addition to that, a declaration from their director of taxation, where he's merely talking about how he conducted a search that he doesn't detail. So the evidence simply isn't there that that tax is not capable of being identified. Thank you, counsel. We'll hear from San Diego. Good morning. May it please the court. Laura Bloom on behalf of the County of San Diego. I'd like to try to make this as simple as possible. There cannot be a meaningful comparison of tax rates without consideration of the taxing district levying those rates. The only way to do this is through consideration of the tax rate areas. And so one would not compare a rate levied in California, for instance, to another state such as Oregon. Likewise, you would not compare a rate levied by a local government, like the city of San Diego, to a local government like the city of La Mesa. And so this is precisely why the County of San Diego alone can have over 5,000 different tax rate areas, different local tax rate areas, that could result in one taxpayer being levied 1.14%, while their neighbor two blocks away may have a rate of 1.21. And so while the 1% Prop 13 rate is the same for both properties, the two different debt service rates, that 0.14 and 0.21, are not comparable to one another. It is not a set tax collected and then allocated based on the portion formula, and it's not a tax from a single jurisdiction. Instead, each is unique, and it's derived by adding, not averaging, the individual rates for the taxing district servicing those properties, the combination of which is different from TRA to TRA. So unlike locally assessed property, BNSF property does not fit neatly into a single local TRA because it spans throughout the entire county. And so ignoring the tax rate areas and limiting BNSF's levy to an average countywide rate will result in more favorable treatment to BNSF than that of local taxpayers and also of other state assessees who are subject to the unitary rate, and that's not what the 4R Act intended. Thank you. Thank you, Counsel. We'll hear from BNSF. Thank you, Your Honor. Ben Horwich on behalf of BNSF Railway Company. I think I might start with Judge Fumate's question about it being difficult to determine the C&I rate. It's not difficult, actually, to determine the C&I rates. They are the rates in the tax rate areas. C&I property pays the rates in the tax rate areas, just like residential property in a given tax rate area pays that rate, and all property does. California is kind of an oddball in that way. It doesn't slice things up by residential property versus commercial and industrial property. It slices things up, at least for debt service purposes, by where are you located physically. And so we do have the C&I rates. The question here is essentially the question the trailer train confronted. It's the same problem the trailer train confronted. So it's not an answer to say trailer train was, you know, this ticket good for this train only kind of a situation where it's just good for this case. No, the problem in trailer train was we've got different rates, and if you don't know specifically where the C&I property is or you don't have just one rate for it, you're going to have to take an average of some sort. And that's what the district court did here. Now, we don't have a list of the C&I property, again, because California doesn't keep that list. Counties don't keep that list separately. And so you do what trailer train did. Again, you're back in the same spot. You say, well, we take an average rate for all the property. Couldn't that also lead to an inaccuracy there? So you say you have two TRAs, and 90% of the commercial industrial properties are in one tax rate, and then only 10% are in the other tax TRA. If you average the two, you're going to have a wholly inaccurate view of what the average tax rate is for commercial properties. You could in theory, but let me try to address that in a couple ways. So the first thing is just I would remind the court we're on appeal of a preliminary injunction. And so the district court has to operate on the information that is available to it. And the information that was available, as my friend on the other side said, included trailer trains observation that this information didn't exist in the 1980s. And there's no suggestion that it actually has changed. There still isn't a separate list of the commercial and industrial property. And that didn't stop trailer trains from saying, well, if you don't have that list, you do the average the way we said. And the other piece of eminence, which is in the record, is a declaration from the NSF's director of taxes who's responsible for California. This is at ER 658, where he says, look, I've looked. I can't find this information. It still doesn't seem to exist. So we put in that the information you might use to do the most precise possible calculation is not available. Now, what did the counties do? Well, the counties, we filed the complaint in November. And this case went to a hearing on a preliminary injunction in March. And so in all of that time, the counties actually resisted even making initial disclosures of what witnesses they might have or what information they might have. And the counties, of course, didn't put any information in the record about what they might. What do they have? A list, a secret list of commercial industrial taxpayers. So, you know, I don't think it actually matters where you would put the burden here because we discharged our burden to say we're in a situation we don't have this information. The counties had every opportunity to provide the information and they didn't. And district judges have to decide cases on the record before them. And that's what the district judge here did. Now, we're entirely comfortable with the idea that on remand, if the counties want to go off on a voyage trying to find a quest to find commercial industrial rates that nobody seems to think exists, that's fine. But we can do that and we'll take that rate if we do that average. We're not trying to get a windfall here. We're trying to use the best information that we have available to us. Could a court order the counties to find that information? Well, I mean, in principle, the court could in the discovery context. Yes, I think so. It may not be proportional to the needs of the case. And I would point out, I would point out to the court that there's not any particular reason to believe that your hypothetical, Judge Bumate, where all the commercial industrial property is sequestered in some corner of the county, that that would actually be true. I mean, common experience suggests that, you know, I have a, I have a shopping center up the road for me and it's, you know, it's in the same area as me, right? So, you know, it'd be a little bit like if someone asked you, well, what are, what's the average income of a left-handed person? You say, well, I don't really have a list of all the left-handed people, but I know what everybody's income is. I don't really have a reason to think left-handed people make that much more or less. So the number could be a tick higher or a tick lower if that information becomes available. But that's why the district court set up the escrow process, because that escrow is not a winner-take-all proposition. If we're off and 10% of it goes back to the counties at the end, that's fine. That's how it should work. But I would, but I would, I want to give your honors some further confidence that we are not, we're not making this up. And you can look at the San Diego numbers and see why this is true. So these are in San Diego's request for judicial notice, where they reproduce this big table with, you know, thousands of tax rate numbers. And this starts at, it's at ECF page 261 of that, of that request for judicial notice. The first three entries are the countywide tax rate areas. That's the ones we pay, and I guess they have three. I'm not entirely sure why, but they have the same rate. It's 1.58% and change. The next few thousand of them, which is everywhere else, you know, the next one on the list, well, it's 1.14 instead of 1.15. The next one is 1.14. The next one's 1.12. And you go down that list, and you would find that the highest number you can find on that list is 1.23 and change. So it's actually mathematically impossible in San Diego to actually reach your, the situation you described, Judge Bouventier, because you can put the property anywhere you want, and it's still going to have a lower tax rate than what the railroad does. And so we're in this situation where there may be a slight inaccuracy in the exact number that the district court has used at this preliminary stage, but it's not going to be wildly inaccurate in that regard. I'd like to maybe turn to the assessment jurisdiction and kind of the textual argument there, because I think Judge Bress's questions were very perceptive on that, and I would just add one thing, which is that it's not simply the fact that the definition of assessment jurisdiction is a geographical area, which suggests that we're talking about physical space, not this kind of juridical space in which things are administratively classified. The counties are reading it as a, you know, assessment jurisdiction is an administrative classification used for, dot, dot, dot. The word's geographical area. The other word that's significant is in, actually, is in B3, which is the word in. B3 refers to other property in the same assessment jurisdiction, and normally when you connect the word in with geographical area, you're talking about property that is physically located in a place. In can mean different things, but when it's associated with geographical area, it means, you know, a railroad is down the street from me. So what is the assessment jurisdiction here? So the assessment jurisdiction here could be the state or it could be an entire county, and we think the better view is that it's the entire county. I will be candid with the court. We don't really have much of a dog in that fight because the numbers come out very similarly, regardless of which you use. We think the better view is that it's a county because the use of the state as a geographical area for assessment is only an intermediate step. Isn't the state essentially doing the assessing, though? A state agency is doing the assessing, but that's a who question, not a where question. But on a statewide basis that's been allocated, and I recognize this is a small feature of the case, but... Yeah, no, I think it's important to get it right, and I think the parties would be grateful if the court gave some precision on that question because it would govern the scope of further discovery. So I do want to address it. So the place that I would direct the court would be the state assessor's manual, which is also in San Diego's request for judicial notice, and this would be at ECF page 329 of that document. And it discusses this allocation concept, and I'll remind the court that the way assessment of unitary property is done is that the system is valued everywhere in the universe, and then a portion of that is allocated to the state, and then the total that's in the state is then broken up and allocated out to individual counties. And in that process, conceptually the state is not actually more than just a step along the way. There's a rule for figuring out how much of the overall fraction you allocate to the state, but then there's another rule for allocating fractions to the counties, and it's things like how many track miles do you have in this county versus that county versus another county. And so the use of the state as drawing a boundary around the railroad's property is only an intermediate step in that process. And so although if your honors look at that assessment manual, it will describe a portion of the multistate unit value must first be allocated to California. It then goes on to say California's portion of the multistate unit value must also be allocated among the state's local tax jurisdiction. And so we think the county is the best view because it's the ultimate one. In principle, you could have any number of intermediate geographical steps, but the last one is the county. And there's another reason behind the policy of the 4R Act that seems most relevant here, which is that this court explained in trailer train, and this is in footnote 11, that the strategy of the 4R Act is that, look, as I'm quoting, as long as the majority of commercial industrial property is taxed at the same rate as rail transportation property, the owners of such commercial and industrial property can be expected to provide a strong check against any state discrimination. And so the idea is that the railroad can't pick up and leave if it says I'm set up with these California tax rates. Other taxpayers can pick up and leave if they're set up with California tax rates. So you want to link the railroad with the other local taxpayers. But it seems in that regard to be more relevant when you're talking about locally issued debt to be comparing the railroad to other taxpayers who are also responsible for that debt service. And that would be at the county level. Your friends on the other side have sort of a counter narrative to that to say, well, listen, you actually invited this scheme. You asked for this, and that's actually relevant to our determination here. Maybe you want to address that. Sure, I would. So the first answer to that, which I'm happy to address, but I think, Judge Bress, you may have answered the first part of the question, which is that's a matter of justification. And justification, if it's anything at all, it's a matter of justification. And justification is a function of discrimination. And B-3, as the Supreme Court said in CSX-2, does not require a showing of discrimination. And the one additional point I would make in that regard is that CSX-2 is very clear that justification is part of discrimination. It's not some separate requirement. So the court said in CSX-2, it is undoubtedly correct that the PACS must discriminate, but it does not discriminate unless it treats railroads differently from other similarly situated taxpayers without sufficient justification. And those last three words are, in fact, italicized in the court's opinion. So it's very clear that discrimination is a function of – excuse me, justification is a function of discrimination. Discrimination is not a requirement under B-3, so we don't even get to the actual proffered justification. But I want to answer that proposed justification on its own terms because that may be helpful to the court. The change that was made was administrative in nature, or it was conceived by its proponents as being administrative in nature. I think in the fullness of time, we wouldn't be here if in the fullness of time we hadn't discovered that this leads to a very substantive disparity. So what happened? Was there some change in circumstances or just something that your clients didn't necessarily appreciate that then manifested itself? I was trying to understand. In 2006, there was some – you got brought into this, and then now you're saying this is unfavorable. But what – do you know what actually happened there? I think it was lack of awareness. And you can see that from the same legislative history of the 2007 change, which – that same legislative history that the counties point to that says, oh, you asked for it, also says – and I'm referring to ER-482 – supporters – so I guess that's the railroad industry again – noted that this bill is revenue neutral. It does not change the amount of taxes the railroads pay, just how the value in revenue is distributed. So what it did is it took it from being a multiplicity of literally thousands of bills issued by a county to a single taxpayer and moved it into one consolidated bill under the method used for unitary property. There's also references to this on 488 as well, ER-488. This is not a tax break for the railroads under this bill. They continue to have the same tax liability with or without this legislation. AB-2670 only changes how the bills are prepared. So I think the best reading of the history is that there was a lack of awareness in 2007, one way or the other, about the substantive effect of this. But I think this actually points up – that actually points up why it would be a completely unworkable standard for this court to say that participation in the political process can somehow justify the suspension of the ordinary operation of the Supremacy Clause. We're talking about two public laws here, and I don't see how a court could go down this rabbit hole of asking, well, who knew what, and what did the California legislature intend, and what did the railroad industry intend, and does it matter that the comments were submitted by a trade association versus one of the parties, and do some railroads still get the benefit of the 4R Act and others don't? Frankly, it just misses the point because the purpose of the 4R Act is not to give the railroads a bargaining chip to make some deal with the state, which is how the counties are thinking about it. The purpose of the 4R Act, which is in its text, is to prevent an undue burden on interstate commerce. That was the motivation for the 4R Act, was that the rail industry was being soaked at the local level by taxes that were many multiples higher than their peers. Railroads are easy prey for that kind of treatment, and Congress recognized that if you allow that, you deprive all of us of a vital channel of interstate commerce by putting this drag on it. I think this court recognized that in the BNSF versus Oregon case from just last year, which is cited in the papers. It's a similar issue where you single out the railroads, and you're harming interstate commerce. That is an interest that transcends any one railroad or somebody asking for something in the political process. It's not ours even to trade away, even if you could think about it that way. Can I ask a question about assessment jurisdictions again? My understanding is California assesses BSNF's value nationwide, and then it assesses it California-wide. Then how does it distribute that California value to the individual counties? The State Board of Equalization is responsible for that. Probably they would say I'm greatly simplifying, but basically to a rough approximation, what they do is they say, how many miles of mainline track do you have in the state, and how many miles of track do you have in this county? If you've got 5,000 miles in the state, that's probably an overestimate, 2,000 miles in the state, and you've got 200 miles in this county, then this county gets one-tenth of the state amount. Got it. Thank you. I believe I may have addressed all of the issues I was hoping to touch on, but I'm happy to answer other questions that the Court might have. Thank you, Counsel. I don't see any further questions. Thank you for your argument. Thank you, Your Honor. We'll hear rebuttal from the County of Alameda, and we'll give you your full five minutes since our questions took you over last time. Put five minutes on the clock. Thank you, Your Honor. I want to address some of the questions that came up in the last presentation. The first question noted the very real possibility that when you use an average tax rate, commercial and industrial property could be clustered at different places in the county. Therefore, the tax rate on commercial and industrial property could be quite different than on other properties, like residential property, timber-growing property, that are excluded from the definition of commercial and industrial property. This is a very important point in this case in a way that it wasn't as important in trail or train. The evidence in the record indicates when we're using an average of all property, as much as 75% of property subject to the property tax in California is residential. That's at ER 653. The CSX 2 court stated that even if a jurisdiction treats railroads less favorably than residential property, no violation of these subsections has occurred. Yet here our tax rate is overwhelmingly informed by residential property. If that's true, couldn't you then make that showing to the district court and perhaps the injunction would need to be modified in some way? Perhaps. Just very briefly, trail or train could tolerate that, could go towards an average tax rate, because there it was looking at a tax differential where unsecured property was literally at two times, more than two times the rate as other property. But here, property under secured rule is what I meant to say. But here, the average difference is 0.38 percentage point. The median difference is 0.29%. So when you're looking at an average rate, when the differences between the railroad tax rate and the 11403 tax rate are that small, you could really be looking at problems here. With respect to producing evidence, yes, that could be done further on down the line. But the average, using the average still creates that problem when the rates are so close as they are here. You need to go back to what the statute requires, which is looking at property in the same assessment jurisdiction. Now on that point, there was a lot of... Counsel, before you move on, what did you mean by 75% of the property tax is residential? The property tax base in California, 75% of it is residential versus commercial, industrial, or other things. Is there any evidence that commercial industrial properties are distributed un-uniformly? Not yet. No, there is not evidence in the record of that. So even if the 75% is residential, if commercial properties are uniformly distributed, then the average would still be okay? Possibly, but there's not necessarily any reason to believe that would be the case when you just think about how typically a county is distributed. Industrial is in a different section than residential, etc. But I want to speak about assessment jurisdiction because this is very important. On the other side, the NSF's council really divorces assessment jurisdiction from a notion of assessment by trying to link it instead to allocation. And the two are simply different. The way the process actually works is as a matter of California constitutional law, the State Board of Equalization has a duty to assess property, not merely allocate it. That's in Article 13, Section 19 of the California Constitution. And as a factual matter, the same is true. My colleague was quoting from the Board of Equalization manual, but that manual makes clear that the unitary value indicators prepared by the board are applied post-interstate allocation. In other words, once the Board of Equalization determines the national value and allocates a portion to the State of California, it then applies value indicators. It actually assesses, values that property. So that's the assessment jurisdiction. The county, when the board then allocates the value of BNSF and railroad property to the counties, it's merely using a formula that was partially described. It's based on historical data and track mileage. It's not related to the value of the property. The California Supreme Court has been clear on that point. The allocation of unitary property to counties has little or no relationship to the actual fair market value of the particular asset situated within the jurisdiction. That's ITT World Communications versus San Francisco. So if assessment jurisdiction means assessment and the 4R Act says that it does, allocation doesn't get you there. Allocation is not assessment. And I'm out of time, and I thank you, Your Honors. Thank you, Counsel. Thank all of you for your arguments and your briefing. It has been very helpful to the court. And we will be in recess for the morning.
judges: Thomas, Bress, Bumatay